**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GABRIEL B.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 C 5258** |
| v. | ) | |
| | ) | **Magistrate Judge Schenkier** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Gabriel B., moves for reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits (doc. # 9: Pl.'s Mot. For Summ. J., doc. # 10: Pl.'s Mem.). The Commissioner has filed a response brief, asking this Court to affirm the Commissioner's decision (doc. # 18: Def.'s Mot. For Summ. J., doc. # 19: Def.'s Resp.). Plaintiff has filed his reply (doc. # 20: Pl.'s Reply). The matter is fully briefed. For the following reasons, we grant Mr. B.'s motion and remand the case.

### I.

Mr. B. applied for disability insurance benefits ("DIB") on September 3, 2014, alleging an onset date of September 26, 2013 (R. 14). Mr. B.'s date last insured was June 30, 2019 (*Id.*). Mr. B.'s claim and subsequent appeal for reconsideration were both denied (R. 14, 90, 107). Shortly thereafter, Mr. B. filed a written request for a hearing in front of an Administrative Law Judge ("ALJ") (R. 14, 124-25). Mr. B. and a Vocational Expert ("VE") testified at the hearing which was

---

[1] On October 3, 2018, by consent of the parties and pursuant to 28 U.S.C § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgement (doc. ## 5, 7).

held on July 7, 2017 (R. 14, 30). On October 10, 2017, the ALJ issued a decision denying Mr. B.'s

claim for benefits (R. 24). The Appeals Council declined to review the ALJ's decision, making it

the final word from the Commissioner (R. 1-3). *See Varga v. Colvin,* 794 F.3d 809, 813 (7th Cir.

2015); 20 C.F.R. § 404.981.

## II.

Mr. B. was born on April 25, 1970 (R. 77, 144). He experienced a work-related back injury

in April 2012, and he underwent L5-S1 fusion surgery on October 31, 2012 (R. 99, 184). Mr. B.

stopped working on September 26, 2013 because his employer could not accommodate his work

restrictions (R. 185). Mr. B. filed a worker's compensation claim and then began vocational

rehabilitation in June 2014 (R. 225). In his function report dated March 5, 2015, Mr. B. reported

that he had pain in his lower back and right foot and leg that prevented him from doing many

things; he needed to alternate between standing or walking and sitting; he was restricted to driving

no more than 30 minutes; he was restricted to working four hours every other day; and he required

use of a cane (R. 192).

## A.

In connection with Mr. B.'s worker's compensation claim, he underwent a functional

capacity evaluation ("FCE") on June 3, 2013 (R. 304-12). Mr. B. demonstrated functional

capabilities at the light to medium level in lifting weights (R. 304). The examiner determined that

Mr. B. was capable of a five to six-hour workday, sitting in 30-minute increments for a total of

three to four hours, standing in 30-minute increments for a total of three to four hours and

occasionally walking moderate distances for a total of two to three hours (R. 305). Mr. B. could

occasionally (6-33% of the day or 0.5 to 2.5 hours) balance, bend, stoop, climb stairs, crawl,

crouch, use his foot, kneel, squat, and flex and rotate his neck (*Id.*). Mr. B. could occasionally carry

70 pounds and frequently (34-66% of the day or 2.5 to 5.5 hours) carry two to seven pounds (*Id.*).

During the assessment, Mr. B. reported pain in his lower back and right leg, calf and foot

(R. 304). He demonstrated difficulty and reported increased pain with sitting, standing and walking

activities (*Id.*). As the assessment proceeded, Mr. B. demonstrated a decreased tolerance to activity

(*Id.*).

Mr. B. received ongoing care from Sean A. Salehi, M.D., the neurosurgeon who performed

his October 2012 fusion surgery (R. 325). On June 25, 2013, Mr. B. was examined by Dr. Salehi

and reported continued pain in his back and numbness in his left leg due to work that required him

to bend and twist (*Id.*). Upon examination, Mr. B.'s gait was normal, his sensation to light touch

was decreased in his right leg and the deep tendon reflexes were diminished in his lower

extremities (R. 326). Dr. Salehi noted that Mr. B. should not bend or twist for more than one minute

more than three times an hour (R. 327).

On September 25, 2013, Mr. B. reported to Dr. Salehi that his pain had worsened and that,

with activity, the pain increased in severity to a seven to eight out of ten (R. 328). Mr. B.'s gait

was slow but otherwise normal and his sensation to light touch was decreased in the right leg (R.

329). Mr. B. was prescribed Ultram and Neurontin for his pain (R. 330). Additionally, Dr. Salehi

limited Mr. B. to desk work with no lifting, pushing or pulling of anything over ten pounds (*Id.*).

On October 1, 2013 Mr. B. underwent a CT scan that revealed sclerotic changes involving

the endplates at the L5-S1 level, a component of congenital lumbar spinal canal stenosis, facet

arthropathy and hypertrophy creating mild spinal and mild to moderate bilateral neural foraminal

stenosis at L3-4 more on the right, and mild to moderate bilateral neural foraminal stenosis at L4-

5 (R. 302). Mr. B. informed Dr. Salehi on October 17, 2013 that he was no longer having right leg

pain and he was no longer working because his employer would not accommodate the restrictions (R. 334). Mr. B. still experienced numbness in his right leg and foot and had stopped taking the medications due to side effects of panic attacks (*Id.*). Dr. Salehi stated that Mr. B. could resume working with his "prior permanent work restrictions outlined" in the June 3, 2013 FCE (R. 336).

## B.

On May 6, 2014, Mr. B. attended a new patient consultation at Premier Pain Specialists with Arpan Patel, M.D. (R. 298). Over the course of the next nearly two and a half years, Mr. B. had 31 appointments at Premier Pain Specialists; 12 appointments were with Dr. Patel, and the remaining were with a nurse practitioner or physician's assistant under the supervision of Dr. Patel or one of his colleagues (R. 380-420, 468-93, 899-904, 923-56).

At the first appointment, Dr. Patel reviewed Mr. B.'s work-related injury and his October 31, 2012 lumbar L5-S1 fusion surgery (R. 298). Dr. Patel summarized Mr. B.'s complaints of pain in his left lower back and radiating to his right lower back; his need to move from sitting to standing to moving to lying down to alleviate the symptoms; numbness in his toes, right knee and right thigh; the symptoms worsening with activities; and constant pain averaging an eight out of ten (*Id.*). Dr. Patel found that Mr. B. had fatigue, blurred vision, loss of balance, irregular heartbeat, excessive urination, back pain, weakness and tingling/pins and needles, trouble sleeping and anxiety (R. 299). On physical examination, Dr. Patel described the pain Mr. B. experienced in his lumbar spine after various tests and noted his antalgic gait pattern (a limp adopted to avoid pain) (R. 299-300). Dr. Patel assessed Mr. B. with sacroiliitis, lumbosacral spondylosis without myelopathy, radiculopathy T/L/S, and postlami back syndrome, lumb (R. 300).[2] According to Dr.

---

[2] Sacroiliitis is an inflammation of one or both of the sacroiliac joints, it can cause pain in the buttocks or lower back and it can extend down one or both legs. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747 (last visited October 24, 2019).

Patel, Mr. B.'s MRI showed facet arthropathy in the lower lumbar facet joints (*Id.*). Dr. Patel started Mr. B. on medications and recommended minimally invasive procedures to attempt to alleviate his pain (*Id.*). Dr. Patel's plan was to optimize Mr. B.'s overall pain condition prior to sending him back to work (R. 301). Finally, after psychometric testing, Dr. Patel noted that Mr. B. had indicators suggesting major depression (*Id.*).

Dr. Patel performed a left sacroiliac joint injection under fluoroscopic guidance on Mr. B. on May 14, 2014 (R. 294). On May 29, 2014, Mr. B. experienced a 50 percent improvement of his left lower back pain (R. 291). Nonetheless, Mr. B. continued to experience pain in a discreet location in his lower left back and the MRI reported facet arthropathy in his lower lumbar facet joints (R. 292).

On June 12, 2014, Dr. Patel performed left L3, L4 and L5 lumbar medial branch blocks on Mr. B. (R. 288). On August 6, 2014, Dr. Patel performed a lumbar transforaminal epidural steroid injection under fluoroscopy on Mr. B. to address his diagnosis of lumbar radiculopathy, spinal stenosis and post-laminectomy syndrome (R. 285).

During a July 22, 2014 visit to Dr. Salehi, Mr. B. rated his pain as a constant seven to eight out of ten (R. 331). Prolonged walking, standing or sitting resulted in burning and cramping in his right calf and he experienced difficulty sleeping due to cramping in his right foot and toes (*Id.*). Driving to vocational rehabilitation, which took an hour, worsened his pain (*Id.*). Upon examination, there was mild tenderness throughout Mr. B.'s lumbar spine and his range of motion was limited (R. 332). Mr. B.'s sensation to light touch was decreased in his right leg, and Dr. Salehi recommended a spinal cord stimulator for Mr. B.'s radicular symptoms (R. 332-33). Dr. Salehi stated that Mr. B. could continue to work under the June 3, 2013 FCE restrictions but for no more than six hours per day (R. 333).

Dr. Patel performed a lumbar transforaminal epidural steroid injection under fluoroscopy on August 6, 2014 on Mr. B. (R. 349). Dr. Patel indicated that he would continue his efforts to obtain authorization for Mr. B. to use spinal cord stimulation (*Id.*).

On August 27, 2014, Mr. B. reported to Dr. Patel that he had "no durable benefit" following the August 6 epidural, and he rated the severity of his right leg pain and numbness at an eight out of ten in severity (R. 282). Mr. B. reported that he had difficulty sleeping, cramping in his right calf, and difficulty at work due to leg pain; that driving an hour to work exacerbated his pain; and that use of a cane may make his six-hour workday more tolerable (*Id.*). Dr. Patel provided Mr. B. with a work note allowing him to use a cane (R. 283). Dr. Patel further noted that psychological testing performed suggested possible MDE (major depressive episode) (*Id.*).

Mr. B. experienced increased pain on September 17, 2014 that he rated at a nine out of ten (R. 279). Mr. B. stated that he was exacerbated working a six-hour day and that he felt pain when he sat or stood for too long (*Id.*). It was recommended that Mr. B. undergo spinal cord stimulation because it has been a proven treatment with post-laminectomy syndrome and was also recommended by Dr. Salehi; however, Mr. B. would need to undergo a psychiatric evaluation prior to being approved for the spinal cord stimulation trial (R. 280). Due to Mr. B.'s increased radicular pain, Mr. B.'s work day was restricted to four hours (*Id.*).

On November 5, 2014, Mr. B. had trouble getting his treatments covered by insurance and his gait was antalgic (R. 276). Mr. B. experienced increased radicular pain and reported that the six-hour work day was physically taxing for him (R. 277). Tramadol was rotated with Norco to help with Mr. B.'s increased pain, and it was recommended that Mr. B. see a counselor or psychiatrist (*Id.*).

On December 30, 2014, Mr. B. rated his pain at an eight out of ten and felt it was increasing (R. 273). He described a constant and sharp pain that was primarily located in his right leg with increasing left-sided low back pain since his last visit (*Id.*). Mr. B. felt the Norco medication was helpful but inquired about an increased dosage due to his severe pain levels (*Id.*). On examination, Mr. B. was not in acute distress, his gait was antalgic, he walked with a cane and the flexion and extension of his lumbar spine was limited (R. 273-74). Mr. B. was assessed with lumbosacral spondylosis without myelopathy, sacroiliitis, radiculopathy, and post-laminectomy back syndrome in the lumbar region (R. 274). Spinal cord stimulation treatment was recommended, and it was reiterated that Dr. Salehi also recommended this treatment (*Id.*). It was noted that Mr. B. underwent an FCE in June 2013, was participating in vocational training four hours a day twice a week, and that he should "continue these work restrictions" (*Id.*). Finally, beyond the spinal cord stimulation treatment, sacroiliac joint injection was recommended, Mr. B.'s Norco dosage was increased, and he was referred to Kenneth R. Lofland, Ph.D. for a mental health evaluation (*Id.*).

From January 2015 until February 2016, Mr. B. was treated on a weekly basis by Dr. Lofland for pain psychology, depression, anxiety and anger (R. 421-56, 494-565, 905-22, 963-1066). Dr. Lofland noted that Mr. B. was on the following medications: Lyrica, Flexeril, Amitriptyline and Hydrocodone (*Id.*). Dr. Lofland used cognitive behavior therapy to lower Mr. B.'s anxiety, depression, anger and pain perception (R. 494-565). Each week, Mr. B. relayed his pain, depression and anxiety levels to Dr. Lofland along with the number of panic attacks he experienced that week (*Id.*). The record does not contain an assessment of Mr. B.'s functional level by Dr. Lofland.

On February 4, 2015, Mr. B. followed up with Dr. Patel complaining of pain in his lower back that radiated to his right calf, foot and toes and explained it was worse with standing, sitting

or driving for long periods of time (R. 313). Mr. B. described his difficulty driving the distance to vocational training and his inability to take pain medication while working (*Id.*). Dr. Patel reiterated his belief that spinal cord stimulation was Mr. B.'s best option for pain relief and that Mr. B. should continue his work restrictions (R. 314).

Mr. B. was again seen by Dr. Patel on February 25, 2015, at which time he reported difficulty driving more than 30 minutes and that working consecutive days caused his level of pain the following day to be severe especially because he could not take pain medication while driving or working (R. 316). Mr. B. rated his pain at a nine out of ten and noted it improved with lying down (*Id.*). The examination revealed tenderness to palpation over left sacroiliac joint, forward flexion limited to 60 degrees, extension limited to ten degrees and the slump seat test and straight leg raise both positive on the right (R. 317). Dr. Patel assessed Mr. B. with post-laminectomy syndrome, lumbar region; lumbosacral spondylosis without myelopathy; sacroiliitis; and thoracic or lumbosacral neuritis or radiculitis (*Id.*). Dr. Patel reiterated his recommendation for a spinal cord stimulator, continued Mr. B.'s medications and limited Mr. B. to driving less than 30 minutes and working only four-hour shifts every other day (*Id.*).

In a progress note dated April 22, 2015, it was noted that Mr. B. was having issues with insurance regarding the neurostimulator trial (R. 468). On examination, it was reported that Mr. B. had tenderness over his left sacroiliac joint, his flexion and extension were limited, and the slump seated test and straight leg test were both positive on the right (*Id.*).

On May 26, 2015, Mr. B. underwent an internal medicine consultative examination with Roopa K. Karri, M.D. (R. 457-60). Mr. B. informed Dr. Karri of his failed fusion surgery in October 2012, that he had pain in his left lower back that radiated to his right foot and leg with numbness and tingling, that he used a cane because his right leg would otherwise give out, his right

foot burned and went numb and tingly and his right calf cramped up (R. 458). Upon examination, Dr. Karri noted that Mr. B. could not walk 50 feet without support, had a small-stepped gait and needed a cane to walk (R. 459). Mr. B. limped and could not heel/toe walk, squat or tandem gait (*Id.*). Additionally, the range of motion in his lumbar spine was limited, the straight leg raise test was positive on the right at 70 degrees, Mr. B. had tenderness in the left sacroiliac joint and decreased sensation to pinprick in his right foot (*Id.*). Dr. Karri assessed Mr. B. with radicular symptoms in the right leg, depression, anxiety and panic (R. 460).

At his June 17, 2015 appointment with Dr. Patel, Mr. B. rated his pain at an eight out of ten and stated that his pain no longer improved when he laid down (R. 474). Dr. Patel reiterated that the spinal cord stimulation was Mr. B.'s only option since he could not take his pain medications while driving or at work (R. 475). Dr. Patel continued to limit Mr. B. to driving less than 30 minutes and four-hour work shifts every other day (*Id.*).

In July 2015, Michael J. Schneider, Ph.D., a non-examining consultant working for the Social Security administration, determined that Mr. B.'s spine, affective and anxiety disorders were all severe (R. 83); that the paragraph B criteria were not met as Mr. B. had a mild restriction of daily living activities, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation (R. 83-84), that there was no presence of the paragraph C criteria (R. 84); and that Mr. B. had a severe mental impairment that did not meet the listing criteria (*Id.*). In assessing Mr. B.'s physical RFC, David Mack, M.D., another non-examining consultant, found in part that Mr. B. could occasionally lift 20 pounds, frequently lift 10 pounds and that he could stand or walk for two hours and sit for six hours in an eight-hour work day (R. 85). It was determined that Mr. B. was capable of working at the sedentary level and, thus not disabled (R. 89-90).

On September 16, 2015, Mr. B. reported to Dr. Patel that he continued to have pain and almost fell in the shower due to his right leg giving out (R. 486). Dr. Patel reiterated that Mr. B. should undergo a spinal cord stimulator trial, and continued the limitations of driving less than 30 minutes and only working four-hour shifts every other day (R. 487).

On September 28, 2015, David E. Hartman, Ph.D., MS, ABN, ABPP-CL evaluated Mr. B., reviewed his file and administered certain tests pursuant to a psychological Independent Medical Evaluation ("IME") referral (R. 881-98). Dr. Hartman reported that although Mr. B. did not exaggerate his cognitive impairment, his symptom endorsement measures were consistently exaggerated (R. 887). Dr. Hartman also opined that Mr. B.'s "out-of-proportion pain complaints, to the degree they are not exaggerated, are likely enhanced by chronic narcotic administration, suggesting the need for detoxification" (R. 896). Dr. Hartman deferred opinions on orthopedic accident-related injury, surgical intervention and ongoing orthopedic status to the appropriate experts (R. 898).

Dr. Lofland issued an addendum on February 6, 2017 to his July 5, 2016 reply to Dr. Hartman's report.[3] Dr. Lofland, who saw Mr. B. weekly for a 13-month period that bracketed Dr. Hartman's assessment, stated that Mr. B. suffers from chronic pain, that Dr. Hartman's comparisons were not fair and thus led to incorrect conclusions, and that Dr. Hartman left relevant information out of his report (R. 905). Dr. Lofland also took issue with the "independent" aspect of Dr. Hartman's report as Dr. Hartman was chosen and paid by Mr. B.'s disability insurance provider and the IME was a risk management tool to deny the claim (R. 907). Dr. Lofland stated that Dr. Patel, as Mr. B.'s primary medical provider and pain specialist and Michael Grear, M.D., the medical IME examiner *infra*, were medical doctors in a better position to document the real

---

[3] The July 5, 2016 reply was not included in the Administrative Record.

nature of Mr. B.'s injuries, and symptoms (R. 913). Dr. Lofland concluded that contrary to Dr. Hartman's report, Mr. B. was not malingering (R. 916).

Mr. B. saw Dr. Patel on April 27, 2016, rated his pain at an eight out of ten and felt that his pain was not well controlled by the medications (R. 939). Dr. Patel prescribed a trial opiate rotation from Norco to morphine (R. 940). On September 21, 2016, Dr. Patel continued Mr. B. on Flexeril and amitriptyline and increased his dosage of Norco due to a recent exacerbation of pain (R. 924). Dr. Patel repeated his recommendation that Mr. B. undergo a spinal cord stimulator trial, and limited him to 30 minutes of driving and working four-hour shifts every other day (*Id.*).

On October 13, 2016, Mr. B. was examined by Dr. Grear for an independent medical evaluation (R. 957-62). On physical examination, Dr. Grear found that Mr. B. walked with a cane, he had positive terminal straight leg raising on the right at 85 degrees, his reflexes were dull but symmetrical at his knee and ankle, he had diminished sensation in his right calf and forefoot, he had no pain in his passive range of motion of his hip and his right knee had full range of motion (R. 958-59). Dr. Grear diagnosed Mr. B. with failed back syndrome and stated that Mr. B.'s treating physician properly stated and supported his diagnosis with objective evidence (R. 959). Dr. Grear opined that Mr. B.'s treatment was appropriate, and that although further treatment was needed, a spinal cord stimulator was "not necessary" (R. 960-61). Dr. Grear stated that Mr. B.'s drug prescriptions, specifically Norco, were reasonable and medically necessary (R. 961). Dr. Grear stated that the restrictions in the July 2013 functional capacity evaluation remain permanent and that Mr. B. is capable of a desk job (*Id.*). Finally, Dr. Grear opined that Mr. B. reached maximum medical improvement and his disability is permanent (R. 962).

## III.

At the July 7, 2017 hearing before the ALJ, Mr. B. testified that his last full-time job was at light duty and he visited the nurse's office at work on a daily basis (R. 30, 41). On September 2, 2014 he stopped looking for jobs (R. 42). Mr. B.'s doctor referred him to a pain specialist because despite the October 2012 surgery being a success, he was still experiencing pain (R. 30, 41). In June 2013, Mr. B. completed a functional capacity evaluation wherein he was not able to do his past work and he could only work for five or six hours a day (*Id.*).

Mr. B. testified that he participated in vocational rehabilitation from July 2014 until May 2016 (R. 42). During the first two months, he took classes in Excel, Outlook and Word (*Id.*). He began by taking the classes three times a week and after he started seeing Dr. Lofland, he resumed the classes with two days at the office and two days at home (*Id.*). Mr. B. was in pain while at the classes despite having an adjustable desk that allowed him to alternate between sitting and standing (R. 43). While taking the classes from home, he was able to lay down periodically (*Id.*). However, even when he worked from home, he did not take his medication because he "can't think clearly, while on the medication" (*Id.*).

Mr. B. stated that he began using a cane after he almost fell a few times, and he explained that he has no control of his right knee and it "gives out" (R. 43-44). Mr. B. described his back pain "like a stabbing in my lower left side and as the day progresses, just radiates to my buttock and the area on the left side" (R. 46).

Mr. B. testified that he had undergone two IME's and he was receiving worker's compensation (R. 47). He saw Dr. Lofland every week and Dr. Patel once a month (R. 49). Pain and stress were the focus of his appointments with Dr. Lofland (*Id.*). Mr. B. did not have a problem with stress and depression prior to his work accident (*Id.*). Mr. B. testified that he was honest with

12

Dr. Patel, who understood his symptoms, and that Dr. Patel did not give him a physical examination every time he saw him (R. 49-50).

Mr. B. stated he could bend over and pick up a piece of paper off the floor but not often (R. 50). He could not get down on his hands and knees on the floor and get back up without supporting his weight on something (*Id.*).

Mr. B. testified that he took the pain medication hydrocodone and muscle relaxer flexeril (R. 51). His dosage of hydrocodone was increased, and morphine did not help with his pain control (R. 51-52). Mr. B. stated he woke up with pain every night and that since he stopped working in September 2013, his pain has gotten worse (R. 53, 55). Mr. B. explained that he's not "functioning correctly" while on the medication, he's "not thinking straight," his reflexes are slower, and the medication slows down his body and mind (R. 60).

Mr. B. testified that the 30-minute driving restriction was reasonable (R. 53). However, after ten minutes of driving, his back started to hurt, and after ten to fifteen minutes there were times that he would drive with his left foot because the bottom of his right foot was cramped (*Id.*).

Mr. B. testified that he walked with a cane because his "knee can give out" but that he can walk inside his house without his cane because he has his couch for support (R. 54). Mr. B. also explained that the bottom of his foot is numb, and he loses control because he cannot feel the floor sometimes affecting his balance (*Id.*). Mr. B. does not "feel too much in [his] right leg" (*Id.*).

Mr. B. testified that his wife handles the grocery shopping, vacuuming, sweeping, dusting, cooking and laundry; he "sometimes" goes to the store to pick up a few items or cooks, but his wife handles the preparation work (R. 59). Mr. B. also testified that if he could have found a part-time job that was every other day, he would have taken it (R. 60).

Mr. B. testified that he alternated from a sitting position to a standing position quite frequently, as often as every ten minutes (R. 60). At times, he could change positions every hour and he stated that lying in bed with a pillow relieved some of the pressure (R. 61). He typically needed to lay down after a half hour (*Id.*).

Mr. B. testified that in July 2015 he was restricted to working four hours every other day after he experienced pain while driving over an hour away to a job fair (R. 63-65). Mr. B. testified that he can lift five pounds but avoids lifting (R. 66). Mr. B. can stand 30 minutes with his restriction but experiences pain after ten to fifteen minutes, he is not able to walk "too far" and he can sit for a half hour at one time (*Id.*).

During the hearing, the ALJ provided the VE with a number of hypothetical limitations in order to determine Mr. B.'s employment prospects (R. 69-73). The ALJ asked whether work was available for a person with Mr. B.'s age, education, work experience and a limited range of light level work who can stand and walk exceeding sedentary work but is only able to lift a maximum of ten pounds occasionally with the option of alternating positions between sitting and standing at least every 30 minutes with only occasional operation of foot controls with right lower extremity, a cane while walking at all times on paved or similar type surfaces, with climbing and hazardous environment limitations, where he cannot drive to work or operate moving machinery, limited to simple, routine tasks, simple decision-making, and simple judgment, working at an average production pace (R. 70-73). The VE testified that this individual would be relegated to the sedentary, unskilled base and could not perform any of Mr. B.'s past jobs, but could work full-time as a packer or assembler (R. 73). However, the VE testified that if the individual exceeded customary limits regarding absenteeism or rest breaks, he would be precluded from those jobs (R.

74).[4] In addition, the VE testified that if the individual was limited to a five or six-hour workday due to physical limitations, that individual would not be able to engage in full-time employment (R. 75). Similarly, an individual limited to working a four-hour shift every other day would be precluded from full-time employment (*Id.*).

## IV.

On October 10, 2017, the ALJ, following the five-step sequential evaluation process, determined that Mr. B. was not disabled (R. 24). At Step One, the ALJ found that Mr. B. had not engaged in substantial gainful activity since September 26, 2013 (R. 16). At Step Two, the ALJ found that Mr. B. had three severe impairments: spine dysfunction, affective disorder and anxiety disorder (*Id.*).

At Step Three, the ALJ determined that Mr. B.'s combination of impairments did not meet or equal the criteria of an impairment listed in 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 (R. 16). The ALJ found that Mr. B. does not have a physical impairment that meets or equals a listed impairment (R. 17). At this step, the ALJ also found that Mr. B.'s mental impairments did not meet or medically equal the criteria of listings 12.04 and 12.06 (R. 17). In doing so, the ALJ considered the paragraph B criteria and determined that they were not satisfied because Mr. B. did not have at least one extreme or two marked limitations in a broad area of functioning (R. 17-18). Rather, the ALJ found that Mr. B. had a moderate limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing

---

[4] The VE testified that the customary limit regarding acceptable absenteeism is one and a half days of work missed per month (R. 74). Regarding extended rest breaks, the VE testified that if an employee is off task more than 15% of the workday beyond what is customarily provided (a half hour for lunch and two 15-minute breaks), then work is precluded (*Id.*).

oneself (R. 17). The ALJ also found that Mr. B. failed to meet the paragraph C criteria required to meet or equal a Listing (R. 18).

Before continuing to Step Four, the ALJ reviewed the record and determined that Mr. B. had the RFC to perform a "range of sedentary to light work" with limitations: he can lift and/or carry up to 20 pounds occasionally and ten pounds frequently; he has no limits in total amount of time he is able to sit, stand or walk in an eight-hour workday; he can stand/walk or sit for 30 continuous minutes; he needs to alternate between sitting, standing and walking every half hour; he can occasionally operate controls with his right foot; he should use a cane and should not walk on uneven surfaces; he can occasionally climb ramps and stairs and occasionally stoop, kneel, crouch and crawl; he can never balance or climb ladders, ropes or scaffolds; he is incapable of repetitive or extreme flexion, extension, or rotation of the spine; he cannot work in hazardous environments (no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, or concentrated exposure to unguarded hazardous machinery); he is limited to simple routine tasks, simple decision-making and simple judgment; and he can work at an average production pace but not highly variable or significantly above average pace (R. 18).[5] At Step Four, the ALJ determined that Mr. B. lacked the RFC to perform the requirements of his past relevant work (R. 23). Finally, at Step Five, the

---

[5] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* § 404.1567(b).

ALJ ruled that there were a significant number of jobs in the national economy that Mr. B. could perform based on his RFC even with additional limitations (*Id.*).

In support of his RFC finding, the ALJ found that Mr. B.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Mr. B.'s statements concerning the intensity, persistence and limiting effects of these symptoms was not entirely consistent with the medical evidence and other evidence in the record (R. 19). The ALJ pointed out that there was no documentation in the record for pain treatment after September 2016 and for mental health treatment after February 2016 (R. 19-20). The ALJ also noted that the record showed no objective signs of deterioration since the FCE in June 2013 (R. 21).

The ALJ assigned considerable weight to the June 2013 FCE prepared in connection with Mr. B.'s worker's compensation proceeding (R. 21). The June 2013 FCE indicated that Mr. B. could perform light to medium work five to six hours per day with sitting three to four hours in thirty-minute intervals, standing three to four hours in thirty-minute intervals, and walking two to three hours (*Id.*). The ALJ also acknowledged that the FCE limited Mr. B. to occasional postural movements and frequent use of hands for grasping (*Id.*). Despite giving the FCE considerable weight and acknowledging that the FCE indicated Mr. B. could only work five to six hours a day lifting up to seventy pounds, the ALJ found that Mr. B. could "complete a *full* workday with less lifting required and other restrictions" (*Id.*) (emphasis added).

The ALJ assigned considerable weight to the medical source opinion from June 2013 limiting Mr. B. to no bending or twisting more than three times per hour and for no more than one minute at a time (R. 21).[6] As such, the ALJ explained that in the RFC, he limited Mr. B. to no repetitive or extreme flexion, extension, or rotation of the spine (*Id.*).

---

[6] The ALJ did not distinguish the opinions by name, but rather by date. Dr. Salehi provided the June 2013 medical opinion (R. 325-27).

The ALJ also assigned considerable or great weight to the medical source opinion from September 2013, which limited Mr. B. to desk work with no lifting, pushing, pulling of more than ten pounds (R. 21).[7] The ALJ determined that this opinion was "essentially consistent" with the RFC but did not find objective support for a limitation of ten pounds (*Id.*). Rather, the ALJ compared the ten-pound restriction to the seventy-pound restriction in the FCE and restricted Mr. B. to lifting no more than twenty pounds (*Id.*).

The ALJ rejected the July 2014, December 2014, and February 2015 opinions that opined that Mr. B. could work no more than six hours per day; four hours per day, just two days a week; or four-hour shifts every other day, respectively, because the ALJ determined that these opinions were based on the subjective complaints of Mr. B. (R. 21).[8] The ALJ found no objective basis for the restrictions because the record showed no worsening of Mr. B.'s condition (*Id.*).

The ALJ assigned great weight to the independent medical examiner's opinion from October 2016 that indicated Mr. B. could perform a desk job as well as work within the restrictions outlined in the June 2013 FCE (R. 21).[9] The ALJ found that this examiner extensively reviewed Mr. B.'s medical history and thoroughly examined Mr. B. (*Id.*).

Next, the ALJ assigned some weight to the opinions of the state agency medical and psychological consultants from July 2015 and January 2016 (R. 22).[10] In doing so, the ALJ found that the limitation of standing or walking only two hours in an eight-hour workday was too limited

---

[7] Dr. Salehi provided the September 2013 medical opinion (R. 328-30).

[8] Dr. Salehi provided the July 2014 medical opinion (R. 331-33). Premier Pain Specialist doctors provided the December 2014 and February 2015 medical opinions (R. 273-74, 313-14).

[9] Dr. Grear provided the October 2016 medical opinion (R. 957-62).

[10] Drs. Schneider and Mack provided the July 2015 opinions (R. 83-90) and Drs. Rozenfeld and Farwell provided the January 2016 opinions (R. 100-08).

(*Id.*). The ALJ did not find moderate restrictions in social functioning but did give Mr. B. the "benefit of the doubt" in finding greater restrictions in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace (*Id.*).

The ALJ rejected Mr. B.'s testimony that he needed to sit and/or stand every ten minutes and lie down every thirty to sixty minutes and that he could only lift five pounds (R. 22). The ALJ found these allegations greatly inconsistent with and unsupported by the physical examinations in the record, noting that only conservative treatment or maintenance occurred and that Mr. B.'s treatment abruptly ended in 2016 (*Id.*). The ALJ also reasoned that Mr. B.'s receipt of worker's compensation benefits likely discouraged him from accepting lower paying work (R. 22-23). Last, the ALJ assigned significant weight to the independent medical examiner from September 2015 including "symptom exaggeration" (R. 23).[11]

## V.

We review the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill,* 900 F.3d 479, 482 (7th Cir. 2018) (internal quotation marks and citation omitted). Mr. B. makes two arguments in favor of remand: (1) the ALJ played doctor and took statements out of context (Pl.'s Mem. at 10-12) and (2) the ALJ's finding that Mr.B.'s statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence is unsupported and unsupportable (*Id.* at 12-14).

"A treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other

---

[11] Dr. Hartman provided the medical opinion in September 2015 (R. 881-98).

evidence in the record." *Gerstner v. Berryhill,* 879 F.3d 257, 261 (7th Cir. 2018); *see* 20 C.F.R. § 404.1527(c)(2); *Lambert v. Berryhill,* 896 F.3d 768, 774 (7th Cir. 2018).[12] When an ALJ does not give controlling weight to a treating physician's opinion, he must then evaluate the opinion by following the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6). These factors include: length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors. *Knapp v. Berryhill,* 741 Fed. Appx. 324, 327-28 (7th Cir. 2018); *Campbell v. Astrue,* 627 F.3d 299, 308 (7th Cir. 2010). An ALJ may not disregard the opinion of a treating physician without offering "a good reason." *Walker,* 900 F.3d at 485.

In this case, the ALJ's evaluation of Mr. B.'s treating doctors' opinions failed to meet this standard. Therefore, we remand the case on this basis, and do not address Mr. B.'s remaining argument.

## A.

At the outset, the ALJ failed to follow the regulatory factors that are to be used in assessing the weight to be given to a treating physician's opinion. Here, Mr. B. had three treaters: (1) Dr. Salehi, the neurosurgeon who performed Mr. B.'s fusion surgery in October 2012 (R. 325) and continued to treat Mr. B. through July 2014 (R. 325-36); (2) Premier Pain Specialists which treated Mr. B. 31 times from May 2014 through September 2016, 12 of which were with Dr. Patel, his pain doctor (R. 380-420, 468-93, 899-904, 923-56); and (3) Dr. Lofland, who treated Mr. B. on a weekly basis for just over a year from January 2015 through February 2016 (R. 421-56, 494-565, 905-22, 963-1066). The ALJ rejected these opinions because he found that they were based on the

---

[12] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for claims filed after March 27, 2017, but the previous rule applies to Mr. B.'s claim which was filed prior to that date. *See Gerstner,* 879 F.3d at 261.

"subjective complaints" of Mr. B. and that there was no objective basis for the restrictions because the record showed no worsening of Mr. B.'s condition (R. 21).

In so doing, the ALJ did not discuss any of the regulatory factors—he did not discuss the length and frequency of the treating relationships; the nature and extent of the treating relationships; supportability for the doctors' opinions found in the record either from each other as specialists, the June 2013 FCE or Dr. Grear's IME; the consistency of the opinion with the record as a whole; or the physician's degree of specialization. The ALJ was required to address the details of these treatment relationships and explain why he was rejecting Dr. Salehi's July 2014 opinion, Premier Pain Specialists' December 2014 opinion and Dr. Patel's February 2015 medical opinion. *Meuser v. Colvin,* 838 F.3d 905, 912 (7th Cir. 2016). Although an ALJ need not explicitly weigh every factor, he must sufficiently account for the factors and build an accurate and logical bridge from the evidence to the conclusion. *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013). Here, the ALJ's unexplained finding that the record disclosed no objective evidence to support the opinions of those treators failed to adequately do so.

**B.**

Furthermore, "ALJs are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings." *Plessinger v. Berryhill,* 900 F.3d 909, 915 (7th Cir. 2018). Here, the ALJ did just that by ignoring the consistency of the June 2013 FCE and Dr. Grear's IME opinion from October 2016 to which he assigned considerable weight and great weight, respectively, with the rejected opinions of Drs. Salehi and Patel concerning the number of hours Mr. B. could work in a day. The ALJ noted that Dr. Grear opined that Mr. B. was capable of a desk job and could work within the restrictions of the June 2013 FCE (R. 21). However, the FCE limited Mr. B. to working only five to six hours

per day, which was consistent with the rejected opinions of Mr. B.'s treaters. Moreover, the ALJ failed to address Dr. Grear's statements that were consistent with Mr. B.'s treaters' opinions, namely that the treating physician properly stated and supported his diagnosis with objective evidence (R. 959); the treatment was appropriate and further treatment was needed (R. 960-61); the drug prescriptions, specifically Norco, were reasonable and medically necessary (R. 961); the FCE restrictions were permanent (R. 961); and Mr. B.'s disability was permanent (R. 962).

Finally, in placing "significant weight" on Dr. Hartman's finding in September 2015 of symptom exaggeration (R. 23), the ALJ failed to even mention Dr. Lofland's February 6, 2017 reply (R. 905-16) to Dr. Hartman's findings let alone determine what weight, if any, to grant to it. Unlike Dr. Hartman, who saw Mr. B. once, Dr. Lofland treated Mr. B. for chronic pain and other symptoms for more than a year on a weekly basis and provided a report and an addendum to Dr. Hartman's report explaining why Mr. B. was not exaggerating or malingering his symptoms. The ALJ was not entitled to give Dr. Hartman's non-treating opinion significant weight without confronting the rejoinder to that opinion authored by Dr. Lofland, one of plaintiff's treaters.

## C.

The ALJ also played doctor by taking the FCE determination that Mr. B. could only work five to six hours a day lifting up to 70 pounds, and transforming that determination into a finding that Mr. B. has the ability to work eight-hour days if he had greater lifting and other restrictions. The ALJ offered no medical evidence to support this determination. To the contrary, the overwhelming majority of doctors who either examined Mr. B. or reviewed his file – including multiple treaters – limited him to a workday of six hours or less: the FCE in June 2013 (limited to five to six hours) (R. 305); Dr. Salehi in October 2013 (limited to permanent work restrictions in FCE) (R. 336); Dr. Salehi in July 2014 (work under FCE restrictions no more than six hours per

day) (R. 333); Premier Pain Specialists in September 2014 (restricting work to four hours per day) (R. 280); Premier Pain Specialists in December 2014 (continue work restrictions of four hours per day twice a week) (R. 274); Dr. Patel in February 2015 (continue work restrictions) (R. 314); Dr. Patel in February 2015 (restricted to driving less than 30 minutes and working four-hour shifts every other day) (R. 317); Dr. Patel in June 2015 (continued 30 minute driving and four-hour shifts every other day restrictions) (R. 475); Dr. Patel in September 2015 (continued restrictions) (R. 487); Dr. Patel in September 2016 (continued restrictions) (R. 924); and Dr. Grear in October 2016 (restrictions in FCE continue to be permanent, disability is permanent) (R. 961).

### D.

Finally, in assessing the medical evidence, the ALJ also characterized Mr. B.'s course of treatment as "conservative" and found significance in his "treatment abruptly" ending in 2016 for reasons that were not clear (R. 22). Again, the ALJ failed to point to medical evidence to support the conclusion that Mr. B.'s treatment was conservative.

The ALJ did not explain why Mr. B.'s multi-year course of treatment – which included numerous injections, pain therapy, prescription narcotic painkillers and a muscle relaxer – was merely "conservative." *See Plessinger v. Berryhill*, 900 F. 3d 909, 916 (7th Cir. 2018) (treatment regimen of injections and narcotics bolsters the credibility of allegations of pain). The failure to pursue more invasive measures such as surgery may not automatically be labeled as "conservative" treatment, *see Huber v. Berryhill*, 732 F. App'x 451, 456 (7th Cir. 2018), especially here, where Mr. B. underwent one spinal surgery prior to the alleged on-set date and his disability was deemed "permanent."

Moreover, "an ALJ must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first

considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186 at *7 (July 2, 1996); *see also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("[A]n ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference ... The claimant's 'good reason' may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects"). The record contains statements that Mr. B. had trouble getting treatments covered by insurance as well as difficulties with worker's compensation (R. 276). The ALJ failed to address why these were not legitimate reasons for Mr. B.'s cessation of medical treatment.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 9) is granted and defendant's motion for summary judgment (doc. #18) is denied. We remand the case for further proceedings consistent with this opinion. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED: October 28, 2019

24